Case number 17-3483, Jones Brothers Inc versus Federal Mine Safety and Health Review Commission et al. Oral argument not to exceed 15 minutes to be shared by attorneys for petitioner and 15 minutes to be shared by attorneys for respondents. Our Eddie Whalen for the petitioner and you may proceed. Good morning, your honors. May it please the court, my name is Eddie Whalen. I'm appearing on behalf of the petitioner, Jones Brothers, along with my colleague, Noel True. Ms. True handled the case in the administrative proceedings. I became involved once the appeal was filed and the constitutional issues arose. And so I will be discussing the constitutional issues, Ms. True will be discussing the substantive issues with respect to the administrative proceeding, and we would like to reserve two minutes of our time. Your honor, this case changed on March 16th of this year. And it changed because this court pressed the government to come forward and discuss the merits of this case. All we had heard prior to that time was waiver, waiver, waiver. When they did that, they waited until 4 o'clock on the afternoon of the final day to come forward and tell this court and tell the petitioners what was pretty clear all along, that they had, in fact, admitted that they had unconstitutionally failed to appoint the administrative law judge in this case. What about the possibility that you forfeited this argument? You know, there's a statute that says you're supposed to raise issues of fact and law in front of the agency, and you did mention the issue eventually, but I wouldn't say argued it. So, I don't know, does that forfeiture provision apply here? Absolutely not, your honor, for two reasons. Number one, the statute that applies here is, for judicial review, it says we must raise it and urge it before the commission. We did that. We noticed it. We told them. They acknowledged that they knew that when they filed their separate support of the motion to strike. And so they knew it was there. We did not sandbag them. We set it forth. At the time, it was a clear issue. We had two courts with different interpretations of the inferior . . . You know, we have cases, I mean, to the extent that statute applies, we have cases that say you can't just identify an issue, you have to present an argument, and I would say what you did was identify the issue. Now, maybe that doesn't apply to constitutional arguments, but . . . Well, your honor, we think it does not apply to this type of constitutional argument. This is a structural constitutional argument involving the Appointments Clause, which the Supreme Court has recognized. And I know there's some cases that are back and forth, but the controlling precedent in this case is Freytag and the Supreme Court decisions that it cites. You cannot waive this type of substitution or this type of argument totally, which is what the government wants. The act is set up so that judicial . . . meaningful judicial review will occur when it gets before this court or the D.C. court. The Congress was very straight about that. But there has to be meaningful constitutional review by this court. It's an Article III court. And part of that means the court, using its discretion, even if that issue wasn't raised before, if it sees a constitutional issue of this ilk, this is fundamental. It goes to the very core of our Constitution. It's not something that can be waived. It's not something I would submit that this court can turn a blind eye to after the government has admitted that what they did was wrong and after they continue to try to put that off. They responded. We've raised this issue. They had 30 days to consider it. Eight days they denied review. No question they could have remanded it. They could have asked for further discussion. They knew it was there. They wanted to avoid it. We filed our brief, our first brief. We raised the issue specifically before this court, which the courts have recognized is sufficient. In fact, the Supreme Court has recognized you don't even have to raise it at all until a supplemental brief after a briefing is done, if it's important enough. There are some cases that seem to go the other way. I think if you look at those cases, Your Honor, none of them involved the whole litany that they discussed, including some of the cases of this court, involved this type of a constitutional issue. This has nothing to do with the Mine Act, which that's what the jurisdiction of the respondents is. It's the Mine Act. It's to determine and adjudicate issues involving the Mine Act, its application, its interpretation, its requirements, and whether or not somebody's violated it. This is a totally collateral, independent constitutional issue that goes beyond anything that they have jurisdiction over, number one, or second all that this court cannot consider. In the Freytag case, the appeal wasn't raised until the appellate court. The cases that they rely upon, only three of them involve this constitutional issue appointments clause issues directly. One of them was the Court of Appeals case in the D.C. Circuit. If you read that case, the court said they denied that waiver had occurred because the petitioner did not raise the issue in its opening brief. The second decision, that was this court's decision, said we don't have to get to that argument because we're going to decide in your favor on the merits, and so you're getting the relief you want, so we do not have to address the appointments clause issue. What happens, so you have this Lucia case, presumably there'll be a decision by June or end of June. If the challengers lose Lucia, then obviously there's not a whole lot probably to do here, presumably, although we'd have to see what it says. So it's more interesting if the challengers win Lucia, right, that that would make, warm your heart. Would you want us to then have us look at that appointments clause challenge in light of Lucia, or would you want us to send to the commission to look at it first? Could the commission look at it first? What should happen next if Lucia comes out the way you want it to come out? The remedy, we believe, Your Honor, and what this court should do is, it was an . . . my client received an unconstitutional hearing. It's tainted, the administrative law judge, the whole proceedings. The proper course for this court is to remand the case back to the commission for a new trial de novo before another, a separate, because this judge is already tainted, another separate judge to consider the case from the get-go. We're not trying to get out of . . . we're not looking for a get-out-of-jail-free card here. That's what we've said is the remedy. That's what we believe is the appropriate . . . How are these ALJs appointed? Are they appointed by a majority of commissioners? No, sir. All of the commissioners? No, sir. Commissioners, just the Chief Justice? No, sir. How are they appointed? The Chief Administrative Law Judge hires them, and there's no commission . . . The commission's not involved at all? Well, I believe the commission, the chairman of the commission, may say it's okay to hire this person, but the commission doesn't make the consideration. They don't vote on it. If you look at the . . . and we've objected to it. They filed a Rule 28 submission of this alleged ratification that they've done, and if you look at that, it says two things I think of very much interest. Now, I've taken the position that you shouldn't look at it, so I realize I'm kind of talking out of both sides of my mouth here, but if you look at what they did, they say that they've known they've had this issue since 2015, and then they turn around and say, we're now going to go back and ratify the unconstitutional amendments as the commission for all 17 Administrative Law Judges. All 17 of them. Why is that so bad?  The Appointments Clause issue goes to structure and how you decide, not what you decide, so why isn't that a good idea for them to straighten it out? That's really . . . I mean, that's an issue . . . I think it's not a good idea because I don't think you can ratify a nullity. If the Supreme Court said if they violated the Appointments Clause, it's a nullity. It's void ab initio. Void is void. You can't go back and ratify something that's void. It's still void. Two times zero is still zero. I'm not saying they can't do what they want to do, but I think they have to go through it properly, follow the individual assessments by the commission because they're making the appointment, then they have to have the oath of office again because it doesn't matter the first time, and then they have to have the commission. That's all part of it. It's all laid out in the Constitution. The Supreme Court has said the Appointments Clause is not etiquette and protocol. It's substantive and it goes to the very core of separation of powers and also to keep this appointment power from being diffused. I think under those circumstances, there may be a proper way to do it. In one of the cases that they cite, the Congress actually stepped in and did it. Certainly Congress could do that, but I'm not sure that the commission can do that on its own. In any event, we think the proper remedy, and this comes out of the Frey case, Frey versus USA, where the court said, if you've got an unconstitutionally appointed judge, you go back and you get a new trial with a new judge. Under your view, we should not address the actual issue that was before the commission at all? The actual issue that was before the commission at all, from a constitutional standpoint? No, the actual issue that got you there in the first place. Well, no, sir. Your Honor, I think the court has the option, and this is what the court did in the Sixth Circuit case. There's so many of these cases we've cited, I can't remember them all by heart. The NLRB case. The court didn't address the Appointments Clause issue because it granted the requested relief on the underlying statutory, and the court said, we don't need to get to that because we're giving you your relief. If we do that, it's fine with you, but if we don't do that, it's not fine with you. If you do that, it would be great with me. Because, frankly, if you do that, my client's better off. Because if you do that, it's over. If you do what I'm asking you to do, we've got to go back and have a whole new trial and proceeding, and we'll come all over again. And if the government does what I think they're going to do, which is take this judge and say, okay, you're ratified now. Now go back and look at the record you did before and tell us it's okay that you were right the first time, and now it's legal. We'll be back here again with that issue. But it's a very thorny problem when you get into this, and they have to unwind it in our case and make it right. So, you want us to decide whether you were properly fined or not? I think the issue is, and I'll have to defer to my colleague, but I think the issue is whether or not the statutory construction was appropriate, and whether or not the OSHA or the mine safety... Well, I understand that, but that's the preliminary question that led... The resolution of that was against your position. Yes. Well, it was against our position as far as... We took the position that the OSHA applied under the statute, because this was not a mine. And the administrative law judge, the unconstitutionally appointed administrative law judge, made findings of fact and conclusions of law, which avoid ab initio. That's the underlying issue. Well, because he was unconstitutionally appointed doesn't necessarily mean his decision was wrong. Well, I guess that's true in an abstract context, Your Honor. But when the Supreme Court says it's void, it's null and void, then whether it's right or wrong doesn't really make a difference. All right. We'll hear from your co-counsel. Thank you. Good morning. May it please the Court. I'm Noelle True on behalf of Jones Brothers, and here to argue where we just left off with Mr. Whalen, and that is the jurisdictional argument in this case, and specifically that MSHA did not have jurisdiction over the sited operation. Jones Brothers has been in the business of building roads in Tennessee for over 40 years when it was doing what it often does, which is using borrowed material from a nearby pit to start repairing a road, when MSHA did what it sometimes does, which is overreach its landmines. What about the fact that Tennessee had quite a few requirements for the rock they were supposed to use to fill the bed? I mean, it didn't seem like they were just taking a shovel and taking the dirt and putting it in there. It looked like there was a lot going on, including the blasting and busting up of the rock. Well, I think that the interagency agreement in the program policy manual really focused on three things in that regard. The location, it was an on-line property here. The use of the material, is it being used for bulk or filled material? And the process. But the process really, in those definitions, isn't on how it's being extracted. It uses the term extract and extraction multiple times. So, it's not how are you getting it out of the ground. It is, are you doing anything to it after you're extracting it? Are you milling it? Are you sizing it? Are you crushing it? And they were not in this situation. They weren't breaking up the rock? Well, the rock was being drilled and blasted, which MSHA's only witness, after talking to his two supervisors, agreed was not the problem here. The drilling and blasting wasn't the problem. Drilling and blasting does break up rock. That's how they got it out of the ground, between that and an excavator. But the issue, even in the cases that the secretary cites, focuses on not how it's gotten out of the ground, but really the use and the process post-extraction. So, there's no doubt here it was being used for bulk. This was the very bottom layer of this road. And even the Tennessee Department of Transportation labels all of these layers, but this bottom layer, by that same body, was called barrow excavation. That's what it was called. In terms of the specifications, the case law allows for an analysis to see if material is suitable to be used as bulk or fill. It says it needs to be mostly used for bulk. And that was the case here. And all of that analysis, them visually looking at it, was done pre-extraction to see if it was suitable to be used as bulk or fill material. You're making the point that the Tennessee folks weren't looking at it after it had come out of the ground to make sure it was of the right size stone? I think they were allowed to be there and they would sometimes visually inspect to see if it, again, the definition allows for debris to be removed and even larger rocks to be removed. The program policy allows for that. So, not all the time, but they were allowed to be there all the time. Sometimes they were there to visually inspect to see if it was suitable to be used as the bottom layer. It seemed like from looking at it that they were regulating pretty carefully what was in the fill and it also seems pretty obvious why. Last time around, the road slid into the river. Rocks are going to help stop that. It seemed like there was some method to what they were doing based on what had happened the last time. I think they were seeing if it was going to be suitable to be used as this bottom bulk layer so that it wouldn't slide into the river. If you look at all of those other layers, they were the more road-dependent layers. All of those other layers were crushed and processed and came from quarries that Jones Brothers doesn't dispute MSHA had jurisdiction over. It's really over this bottom layer, which was bulk. It was called barrow excavation in the contract. One more feature that seemed to work against your client and that was the length of time. Was it over a year that they were at this so-called temporary borrowing pit? I think it was from April to August. The regulations to distinguish a borrowing pit from a quarry seem to more speak to a one-off kind of thing. Right. This spans such a length of time that seems to eliminate it from the borrow pit classification. I think Jones Brothers' position on that point would be that the definition doesn't specify a duration, but that when it says one time, is the pit being used for a one-time purpose in this situation to repair that nearby road? It's not like the Kerr Enterprise case where you had a pit that was continuously being extracted and sent to 50 different customers with 50 different uses. It's all used at one spot. Correct. Rather than duration, that's the way you would have a three-day. Yes, Your Honor. I see. Okay. Thank you. Thank you. We'll hear from the government. Thank you, Your Honor. May it please the Court, Josh Salzman on behalf of the Secretary. I'll be addressing the Appointments Clause and the related issue of forfeiture. My colleague, Ms. Kiefsky, from the Department of Labor, will speak to the jurisdiction of the Mine Safety and Health Administration. Thank you. Now, as this Court recognized before, by statute, this Court can only address an issue that was not properly exhausted before the Commission if it finds, quote, extraordinary circumstances. Can I just stop you there? Sorry to break your momentum. But why should I assume that the word law in the exhaustion statute goes beyond statutory arguments? So, for example, that would include constitutional avoidance arguments. But as I think the questions we told you we're going to ask suggest, I don't think the Commission or the ALJs have authority to invalidate the whole statute. That's not how this works. I mean, they're creatures of a statute. They can't invalidate what their creator created. So why isn't the better way to think about this that the word law just refers to statutory arguments? There are two important presumptions sort of buried in there. And I'd actually like to disentangle them and explain why and address them separately. First, your assumption in that question is that this case would involve the invalidation of a federal statute. And it wouldn't. Because the relevant statute is 30 U.S.C. 823b2. That vests the appointment power. Congress vested the appointment power over these ALJs in the Commission as a whole. Now, the Commission as a whole is a, quote, head of department. And we know that from the Free Enterprise Fund versus PCAOB case, page 511. So if the Commission is a head of department, it is, per the appointments clause, authorized to appoint inferior officers. The reason we have an appointments clause violation here isn't because of a defect in any federal statute, but rather because the Commission adopted a practice of delegating its authority to its chief ALJ. But the Commission has the authority. There's absolutely nothing that says the Commission can't. So is a way of thinking about it that that's an as-applied constitutional problem or as-implemented constitutional problem? I mean, you're still agreeing it's a constitutional problem. I'm agreeing that it's a constitutional problem, but there's a pair of Supreme Court cases that are very relevant here. The first actually involved this very Commission, Thunder Basin versus Reich. And the second is a 2012 decision called Elgin versus U.S. Department of the Treasury. And what those cases made clear is it's routine for administrative agencies to opine on constitutional questions, except when what doing so would require them to, quote, pass on the validity of a legislative enactment. This case doesn't involve that. All the Commission would have to do is to recognize that its own conduct had failed to conform to the appointments clause. So just so you hear what the questions are, that means the word law in the exhaustion statute, because I'm taking you back to the statutory interpretation point, has more than one meaning. In other words, the word law is going to pick up some constitutional arguments, but not other constitutional arguments. And that bifurcation is bizarre to me. Your Honor, I think all constitutional claims have to be pressed before the Commission. Even ones they can't rule on. Elgin is explicit on this point, Your Honor. If you look at page 2138 of that opinion, that was in fact the central issue in Elgin. It was assumed that the MSPB couldn't resolve the facial constitutional challenge at issue there. And a majority of the Supreme Court said, you still need to exhaust that claim before the agency, because one of the considerations the court pointed to was the fact that the agency would assist with the building of a record. But here I think it's also notable that the Commission should have the opportunity to consider its own possible error and to correct it. So just to be clear, I'm all for the idea of what is good practice. I completely agree good practice is to let them know, because they could correct the problem, no matter what kind of constitutional challenge it is. But the question is, what are the consequences of not doing it? And I think what you want to do is say law does refer to constitutional claims, but then fix this problem through extraordinary circumstances. Is that kind of your way of thinking about it? Well, I think extraordinary circumstances is a safety valve that the statute preserves. Now, to our knowledge, in 40 years of Mine Act history, no court has ever found a reason to use that safety valve. But that safety valve's there, and I agree that under FRITAG, this court has the discretion to reach out and decide this constitutional question. But I think the presumption under the statute is that it shouldn't have to. Let's say Lucia doesn't come out the government's way for the sake of argument. And let's say, for the sake of argument, we think they should be able to have this claim addressed. I realize that's against your position. What would you have us do? Would we send it to the ALJ to decide these issues first? Or would we send it to the Commission to decide the issue? Or would you prefer that we decide the issue? I think the appropriate outcome here, if this court is inclined to overlook the forfeiture, one thing you might want to do is hold for Lucia, as you suggest. But then, depending on the outcome there, I think the right outcome is to send this back to the Commission for further proceedings. And why not the ALJ? Does the ALJ have no authority? Well, the Commission, I think, would assign it to the ALJ, consistent with its own practices. But I think from the direct relationship between this court and the Commission, I think the way these things would normally be handled is you would remand to the Commission for further proceedings. And the Commission, could they decide appointments clause challenges in light of Lucia at that point? So don't go down the road of saying they're just going to fix it to avoid litigation. Assume they want to stand by their old system. Because, for example, they think the ALJs for the Mine Commission are different, or have different responsibilities. Could the Commission decide the question? I think the answer is yes. But I do want to emphasize that the Commission has already indicated what it's going to do, as we notified the Court. I'm aware of that. I'm aware of that. I'm just trying to explore your theory of forfeiture. So, could the Commission address it? I think the most relevant place to look is page 215 of the Thunder Basin decision, where the Supreme Court explicitly recognized that the Commission does have a practice of addressing constitutional claims, including constitutional claims that go to the facial validity of a statute, which isn't even involved here. Because, as I said, all that's at issue is the Commission's own past practice, which it has the ability to pass on, and it has the ability to unilaterally fix. So, I'm going to have to go back and look at Elgin, but when I looked at it before, I was underwhelmed in terms of its relevance to this case. I'll go back and read it, because you're speaking with conviction. But I want to ask you a question. Take it outside of this law, just really trying to isolate the point, because it's just my intuition about the case, and it could be wrong. But just imagine a core constitutional challenge to a statute that an agency implements. It is attacking it in every single component. It's saying the whole thing can't be done. And let's say, as I'm pretty confident is true, the agency does not have authority to nullify what Congress has created. And you have an exhaustion statute for that agency just like this one. It just seems really bizarre to me. I see the virtue of telling them, because the President and an agency can fix constitutional challenges, so I certainly think they should be raising it. I get that entirely. But the idea that it's forfeited when they don't is a real head-scratcher to me, because I say to myself, what good, they couldn't have acted on the claim. It's just very strange to require someone to present a claim to somebody who can't do anything about it. Again, there are two ways of thinking it. Elgin's your best argument to that. I think Elgin does speak to that. I particularly look at footnotes 6 of Elgin. That's the problem, I don't read footnotes. That's why I missed it. It construes Thunder Basin. Thunder Basin I find even more underwhelming, just so you know where I'm coming from. In the most extreme case, where you're talking about the validity of the agency as a whole, the Supreme Court did address that circumstance in Free Enterprise Fund, and found that that was outside the scope of the channeling requirement. Outside the scope of the exhaustion rule. That forces us into this goofy idea that law means some type of things, but not other types of things. Whereas it's so much easier to say law just means statutory interpretation challenges, including constitutional avoidance challenges. I don't think it requires giving two meanings to the word law. What Free Enterprise Fund held was not, just held that that kind of claim, that particular, very specific kind of constitutional claim, just fell outside the channeling requirements altogether. Not that it wasn't subject to forfeiture. Because I think it is important to understand that constitutional claims, including claims involving fundamental rights, are forfeited all the time. In fact, normal appellate review and judicial procedure would be wildly upended if the mere fact that an important right was at stake would mean that there was no exhaustion requirement. As both the D.C. Circuit and the Federal Circuit have held in the In re D.B.C. and the intercollegiate case, that includes the appointments clause. You do have to present those challenges in a timely way. I'd also note that the Supreme Court decided a case called L.A. Tucker, which involved an invalid appointment and that was a statutory problem, not a constitutional problem with the appointment. Setting that aside, that case was almost on all fours with this one. And there the Supreme Court said, yes, the appointment was invalid. Yes, if this had been timely raised, the proceeding should be thrown out. But we're not going to treat it as a nullity. Because litigants have an obligation to bestir themselves and to raise their challenges in a timely way. That's not what Jones Brothers did here. And as a result... I think you've kind of hinted at this, because I think you're the one that's going to talk about this. If the government loses Lucia, have you already taken the position that this commission and its ALJs are sufficiently like the ones that issue in Lucia that you'd want to do some revamping? Because I know you've already done some changes. But can you preview this for us? Or have you not committed to that yet? We have said in our supplemental brief in this court that we believe, because there was a delegation made here, which again was not required by the statute, but there was a delegation to the chief ALJ, we think an appointments clause violation has occurred. That's something the Department of Justice, the executive branch determined here. Now we also believe that this is a problem that's fixable if the commission appoints its ALJs, which in fact it has since done. So what should happen with this case? We're not likely to have another oral argument after Lucia. We don't know what's going to happen, but if the government loses, well, not loses anymore, but yeah, I got that wrong, sorry. You can understand why. So effectively Jones Brothers side wins. What do you want us to do? We want you to remand this back to the agency for further proceedings. Without... There's really no reason for us even to do much interpretation of Lucia. I think that's right. Assuming we don't say there's a forfeiture, which I know is your first order of business. Yes. Remand for review under the new regime. Yes, Your Honor. The new method of appointing. Exactly. And then we don't address the issue of whether it was a borrow pitter or mine. I think if the court concludes that the appointments clause violation here was not forfeited, then I think the right outcome is to remand on that. Without addressing that issue. Thank you. There's just so many chances we get, though, to talk about borrow pits. That's going to be the really hard part of that suggestion. Yes, Your Honor. No, there are no further questions. No, I really appreciate your answers and argument. We'll hear from your co-counsel. Morning, Your Honor. Are you here to talk about the thing he doesn't want us to do anything about? Yes. Your Honor, this operation is a mine masquerading as a borrow pit. Borrow pits, in our perception, are simply these sort of operations  and I'm not going to go into the details of this, but when one or two people come with a backhoe and get some dirt, it always has to be overburdened because that's what the rules say. Get the dirt and move it from one place to the other without any differentiation in what is extracted and what is ultimately used. That's not the case here. This is a full-fledged mine that's been in operation for over a year from August 11th of 2015 to August 17th of 2016. It had eight employees working six days a week for the duration of the time. So is the duration, you heard your opponent say, duration isn't all that key, that it was only used on this particular patch of road that's nearby and that it's only for the first layer. So you say it's a mine and of course you hear the other side say it's not, so we're looking for the pinpoint rationale that distinguishes it and distinguishes what your opponent says. Your Honor, a borrow pit contemplates overburden. That's what characterizes a borrow pit. That's not what happened here. They moved the overburden out of the way to get to the real goods. The real goods were these gridded solid rocks that were below. Doesn't anybody who's going to use a borrow pit need to first move the overburden? The overburden, yes, the overburden is what characterizes the borrow pit. They never go below. It's the overburden that's the thing that they need. This is not what happened. They moved that overburden away, Your Honors, and then went to the gridded solid rock below. And this operation must have been really, really lucky. Mother Nature must have been good to them because for six days out of every week for a whole year, they hit the nail on the head. When it came to these specifications that the Department of Tennessee needed, it had to be sound, it had to be biodegradable. And every single time some of that rock came out of the ground, it was perfect. And it wasn't a small operation. This was 68,000 cubic yards of rock. Just to put that into perspective, Your Honor, this would be enough rock to fill your stadium here in town, the Bengal Stadium, from top to bottom. Yes, and it was six acres. And this is a lot of rock with lots of sophisticated equipment, 18 pieces. That's not what was contemplated as far as a borrow pit is. It was a simplistic kind of operation where there was nothing sexy about what happened. They took some dirt, moved it from one place to the other, and I don't suspect an operation like this is what the Assistant Secretary of OSHA and MSHA contemplated when they thought of borrow pits. It was just a simple operation. This is a mine that's been going on for years. It's a mine. In the sense that, in a colloquial sense, I'm not suggesting the legal issue, but it is a borrow pit in that they're digging a hole somewhere and taking stuff to use under the road or whatever is being constructed. But in this particular case, if this site, if they had looked at it as a convenient place for a borrow pit and it turned out to be all sand, they would have to keep looking until they found something that would correspond to the specifications that the state required. Absolutely, Your Honor. It wasn't only the physical appearance of this rock. There were five or six physical issues, but then there were also chemical issues. There were soundness tests, and they had to go through all of these. There's one test that mimics different seasons. It's like five or four years of winter and summer that could be done chemically in one fell swoop that would sort of give both sides the answer to what would happen to this rock after five years. Because it was being put into this river, the Keeney Fork River. This was not a borrow pit by, certainly from our standpoint, this was a mine that was trying to masquerade as a borrow pit. Thank you, Your Honor. My time is up. Mr. Whalen, you have some rebuttal here? I'm going to try to be brief, Your Honor, and I do want to save some time for rebuttal because I think there's an important point that my colleague needs to make. You're going to share rebuttal? I'm going to go very fast. The Supreme Court has said, Your Honor, in three different cases, Freytag, Gilligan, and Lamar, that in a rare or exceptional case, regardless of whether it was raised before, when it's a structural, fundamental constitutional issue like this, it needs to be considered. Here we have respondent agencies who have, after trying to hide the pea under the walnut shell for a while, has now come forward and admitted that this was a fundamental appointments clause issue, that they violated the appointments clause with this administrative law judge. If this is not a rare or exceptional case, what is? Okay, thank you. One other thing, real quickly. The Thunder Basin case and the Elgin case, Your Honor, Thunder Basin involved this commission. In that case, the important point is, this court, or the Supreme Court, ruled that the statutory procedures needed to be followed, but that the plaintiff, because they tried to circumvent it by going to district court and got an injunction. And the court says, no, you can't do that. Congress has said the designated appellate courts are going to be the Article III courts that consider this for meaningful constitutional review. And they said, and then the Elgin case came back later, and I believe that counsel was very selective in the way he quoted these cases. We'll read them. I understand that. But the Elgin case reaffirmed that and said, if you have a statute that would preclude constitutional consideration, then that would raise a very, very serious constitutional issue in and of itself. And what they're basically saying is that's what happened here. Got it. Thank you. Thank you, Your Honor. And I'll turn it over to Ms. True for 30 seconds. It might be even quicker. The only point I would make is just that the Secretary's argument in litigation about this being rock and not overburden was not Imsha, the authorized representative of the Secretary, the Imsha inspector. His testimony after he talked to both his field supervisor and the entire district manager was that the material here was not the issue. That was not Imsha's issue. All right. Thanks to all four of you for the briefs and arguments. Thanks for answering our questions. We appreciate it. The clerk may submit the case and call the next one.